# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CARMALITTA I. COCKRELL,**

    **Plaintiff,**

v.                                                                                       Civil Action 2:18-cv-1124
                                                                                         Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## OPINION AND ORDER

Plaintiff, Carmalitta I. Cockrell, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II. The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 11, 12). For the reasons that follow, Plaintiff's Statement of Errors (Doc. 15) is **OVERRULED**, and judgment is entered in favor of Defendant.

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff filed an application for Disability Insurance Benefits on June 26, 2015 under Title II, alleging disability beginning on December 15, 2012. (Doc. 10, Tr. 204–15). Her application was denied initially and again on reconsideration, and after a hearing held on November 15, 2017 (Tr. 33–89), Administrative Law Judge Timothy Gates (the "ALJ") issued an unfavorable decision. (Tr. 15–27). The Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision for purposes of judicial review. (Tr. 1–6).

Plaintiff filed this action on September 27, 2018 (Doc. 1), and the Commissioner filed the administrative record on December 7, 2018 (Doc. 10). Plaintiff filed a Statement of Specific Errors (Doc. 15), the Commissioner responded (Doc. 16), and Plaintiff replied (Doc. 17).

Defendant subsequently filed a Motion to Hold This Proceeding in Abeyance Pending *O'Neal*, asserting:

> One of the main issues before the Court in this case is whether the jobs the vocational expert testified about, and the Administrative Law Judge relied upon at step five of the sequential evaluation process, were obsolete because they were based on jobs present in the Dictionary of Occupation Title (DOT). In making this argument, Plaintiff maintains that the Occupational Information Network (O*NET) is a more appropriate resource for job information, and that the jobs the vocational expert relied upon in this case were not consistent with O*NET. The Sixth Circuit is currently considering a case that directly raises this same issue in *Hugh O'Neal II v. Commissioner*, 18-2372. It is expected that the Court will issue a decision later this year and clarify the issue of whether a job is considered obsolete if it does not appear on O*NET in the same form as it is listed in the DOT, and if a vocational expert must take O*NET into consideration or can rely on the DOT in combination with her/her expertise in the area. Accordingly, the Commissioner requests that this case be held in abeyance until the Sixth Circuit issues a decision in *O'Neal*, and requests that she have 15 days from the date of the Court's decision to file any supplemental briefing in light of the Court's ruling.

(Doc. 18). The Court granted that Motion and stayed the case until a ruling in *O'Neal*. After the Sixth Circuit's decision in *O'Neal*, the parties submitted Supplemental Memoranda (Docs. 23, 24) about the effect of it on this case. This matter is, therefore, fully briefed and ripe for resolution.

### B. Relevant Medical Background

Plaintiff's two statements of error concern the ALJ's (1) reliance on the testimony of the Vocational Expert and (2) analysis of Plaintiff's treating psychiatrist's opinion. The ALJ helpfully summarized the relevant mental health evidence:

> The record shows that the claimant was treated at the emergency department on January 16, 2014 complaining of depression and anxiety (Exhibit 1F/1). On examination, the claimant was anxious and in mild distress. However, her

2

cognition was normal, thought process was normal and insight and judgment were normal. She had no motor or sensory deficits. Her symptoms were described as only moderate (Exhibit lF/1-3). The claimant had recently had a baby and also recently moved and was struggling with these changes. However, she demonstrated appropriate interactions with her baby and her friend. The claimant was discharged in stable condition (Exhibit lF/6). Treatment notes from October 20, 2014 show that the claimant denied any complaints and had a stable mood (Exhibit 4F/1l).

In December 2014, the claimant reported feeling "overwhelmed" (Exhibit 5F/22). On examination, Allison Dailey, M.D., noted that the claimant had appropriate grooming and hygiene, she was cooperative with good concentration and intact memory. She was also found to have good attention and organized thought processes (Exhibit 5F/23). On January 14, 2015, the claimant reported high levels of anxiety due to stress of taking care of the house with additional people living there (Exhibit 5F/19). On examination, the claimant had an anxious mood but good concentration, good memory, and good attention (Exhibit 5F/20). On February 25, 2015, the claimant reported that she was depressed but on examination, she was found to be alert oriented, and cooperative with good eye contact (Exhibit 4F/6). At an April 7, 2015 follow up appointment, the claimant reported that she was feeling "very stressed out" and had high levels of anxiety about her children (Exhibit 5F/16). The claimant was tearful and anxious on examination, but otherwise had normal findings. She was diagnosed with anxiety and depression and her medications were changed to address her symptoms (Exhibit 5F/17). The next month, the claimant reported that she was still struggling with anxiety and was unable to leave the house (Exhibit 5F/13). However, Dr. Dailey noted that the claimant was able to make it to her appointment (Exhibit 5F/13). On examination, the claimant was tearful and had an anxious mood but otherwise had normal findings (Exhibit 5F/ 14). In a June 2015 appointment, the claimant again had normal findings and Dr. Dailey noted that the claimant routinely runs out of her Ativan (Exhibit 5F/10). In visits the following months, the claimant continued to present with normal findings on mental status evaluation (Exhibit 5F). She reported stressors such as her husband losing his job and her medications were adjusted (Exhibit 5F/4). In a medication check on February 25, 2016, the claimant reported that she continued to feel "overwhelmed" (Exhibit 8F/15). Her mental status examination revealed mostly normal findings but she was told to call if symptoms got worse (Exhibit 8F/17).

On February 29, 2016, the claimant was admitted to inpatient mental health treatment for a brief time due to depression and vague thoughts of "no longer wanting to be here" (Exhibit 7F/50). She was diagnosed with posttraumatic stress disorder, personality disorder, depression and generalized anxiety disorder (Exhibit 7F/50-51). On mental status examination, the claimant appeared unkempt and anxious (Exhibit 7F/53). She was unable to focus or sustain attention and had limited judgment (Exhibit 7F/54). She was discharged on March 2, 2016 with

3

medication (Exhibit 7F/45). Primary care treatment notes from March 17, 2016 show that the claimant's anxiety was "stable" and she had a normal mood and affect and was cooperative with good eye contact (Exhibit 9F/8).

In a follow up mental health appointment in April 2016, the claimant reported that she was doing better and her mood was improved (Exhibit 8F/12). In medication check visits in June and October 2016, the claimant reported that she was doing well with her medication (Exhibit 8F/5, 8). A treatment note from August 2016 shows that the claimant was cooperative and made good eye contact and reported that her mood was stable with medication (Exhibit 9F/19).

(Tr. 21–22).

The ALJ then turned to the record of Plaintiff's physical impairments, focusing primarily on her treatment records for carpal tunnel syndrome:

A January 2014 physical examination showed that the claimant had normal range of motion (Exhibit 1F/5). Treatment notes from November 2014 show that the claimant reported numbness in her fingers (Exhibit 4F/8). In January 2015, the claimant continued to complain of bilateral upper extremity numbness (Exhibit 3F/7). She was diagnosed with bilateral carpal tunnel syndrome, severe on the right and mild to moderate on the left (Exhibit 3F/7-8). On February 3, 2015, the claimant had right wrist endoscopic carpal tunnel release and left wrist carpal tunnel steroid injection (Exhibits 2F/1, 7F/93). On February 16, 2015, the claimant had a follow up visit and was found to have mild swelling, no pain and no numbness (Exhibit 3F/4). She had full range of motion, mild tenderness and normal grip and strength (Exhibit 3F/5). The claimant was told that she could return to normal daily activities (Exhibit 3F/6). At a February 25, 2015 follow up appointment, the claimant reported that she was healing well (Exhibit 4F/6). In a February 2016 treatment note, the claimant reported that she was feeling good (Exhibit 9F/1). A March 2016 treatment note documents that the claimant denied any issues other than that she stopped taking her birth control (Exhibit 9F/6). In August 2016, the claimant reported "feeling well" and the claimant denied joint pain and muscle weakness (Exhibit 9F/22). In March 2017, the claimant again reported that she was feeling well and the notes show that she had normal gait and activity (Exhibit 9F/27). The claimant was seen in August 2017 and she reported some right wrist pain (Exhibit 9F/30). She was diagnosed with carpal tunnel syndrome and given a wrist splint (Exhibit 9F/31).

(Tr. 22–23).

4

### C. The ALJ's Decision

The ALJ found that Plaintiff had the following severe impairments: bilateral carpal tunnel syndrome post release on the right, obesity, depressive disorder and anxiety disorder. (Tr. 17). The ALJ held, however, that there was no medical opinion of record to indicate the existence of an impairment or combination of impairments that met or equaled in severity the level of the Listings of Impairments. (Tr. 18).

As for Plaintiff's RFC, the ALJ found:

> [T]he claimant had the residual functional capacity to perform medium work, as defined in 20 CFR 404.1567(c), except that she could operate hand controls with the right hand frequently, operate hand controls with the left hand frequently, could frequently handle and finger bilaterally, could occasionally climb ladders, ropes and scaffolds, and could frequently crawl. Additionally, the claimant was limited to simple, routine tasks with no strict production requirements and could occasionally interact with supervisors, coworkers and the general public.

(Tr. 20).

In formulating Plaintiff's RFC, the ALJ considered the opinion of her treating psychiatrist, Dr. Dailey, and assigned it little weight:

> The claimant's treating psychologist completed a functional capacity form and this has been given little weight (Exhibit 1F). Dr. Dailey regularly treated the claimant and is a psychiatrist but her opinions on this form are not consistent with the evidence as a whole and they are not consistent with her own treatment notes. For example, Dr. Dailey found that the claimant was markedly limited in her ability to understand, remember or apply information and concentrate, persist or maintain pace, yet throughout her treatment notes, she documented that the claimant had intact memory, good concentration and good attention (Exhibit SF/2, 8, 11, 14, 17, 20, 23). In fact, the majority of her mental status evaluations reveal normal findings (Exhibit 8F/3, 6, 9, 13, 16, 9F). Dr. Dailey opined that the claimant would be off task 20% of the workday and miss four or more days a month, yet she did not provide any support for that opinion. Again, her mental status examinations were generally benign and the claimant was able to daily care for very small children, shop, care for pets and perform household chores during this time. Therefore, overall, Dr. Dailey's opinion is given little weight.

(Tr. 24).

The ALJ then analyzed whether there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (Tr. 25–26). Relevant here, the ALJ relied on the testimony of the VE to support his conclusion that there were:

> To determine the extent to which [Plaintiff's] limitations erode the unskilled medium occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as machine feeder *(DOT* 699.686-010) (55,000 jobs nationally), cleaner *(DOT* 323.687-010) (250,000 jobs nationally) and packing and filling machine operator *(DOT* 920.687-078) (200,000 jobs nationally).
>
> The vocational expert testified that the jobs he provided would not require detailed written or oral instructions based both on his experience in the field, his teaching experience and his research experience related to these jobs. Accordingly, the vocational expert's job information is found to be reliable. The vocational expert has professional knowledge and experience in job placement. His testimony was consistent with the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations* (SCO) defined in the revised *DOT* (SSR 00-4p) and accurately identified the types and approximate number of jobs that the claimant can perform.

(Tr. 26).

The ALJ rejected at least one of Plaintiff's objections:

> The claimant's representative objected to the job numbers on the ground that the vocational expert's methodology for determining numbers of jobs is not reliable. The undersigned overrules this objection. Further, the undersigned did not grant a supplemental hearing as requested by the representative in Exhibit 18E. The vocational expert has professional knowledge and experience in job placement. Furthermore, the vocational expert listed his sources which are consistent with those set forth in 20 CFR 404.1566. Accordingly, the vocational expert's job information is found to be reliable. Notably, the vocational expert listed over 500,000 jobs at the medium range of exertion that fit within the residual functional capacity.

(*Id.*).

6

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff asserts two statements of error. First, she argues that the ALJ erred by relying upon jobs identified by the vocational expert without properly addressing Plaintiff's post-hearing objections and rebuttal evidence regarding that testimony. (Doc. 15 at 2–12). Second, she contends that the ALJ erred by failing to properly evaluate the opinion of her treating psychiatrist. (*Id.* at 12–20). The Court addresses each of these arguments in turn.

### A. Post-Hearing Objections and Rebuttal Evidence

Following the hearing, Plaintiff submitted objections and rebuttal evidence in response to the VE's testimony that sufficient jobs existed in the national economy for an individual with her age, education, work experience, and residual functional capacity. Specifically, Plaintiff (1) "submitted a rebuttal opinion and corresponding objection of Paula Santagati, a vocational rehabilitation counselor" and (2) "objected to the jobs named by the VE as fitting the hypothetical (and ultimate RFC finding)" based on the outdated information provided in the Dictionary of Occupational Titles ("DOT"). (Doc. 15 at 7). She argues that the ALJ erred because he allegedly did not consider these objections in his written opinion. (*See id.* at 2–12).

Numerous courts throughout this District and Circuit have considered similar, if not identical, arguments. *See, e.g.*, *Turner v. Comm'r of Soc. Sec.*, No. 2:19-CV-900, 2019 WL 5781608, at *4–8 (S.D. Ohio Nov. 5, 2019); *Zimmerman v. Comm'r of Soc. Sec.*, No. 1:18CV1233, 2019 WL 4736267, at *5–12 (N.D. Ohio Sept. 27, 2019); *White v. Saul*, No. 5:18-CV-362-JMH, 2019 WL 4684445, at *4–7 (E.D. Ky. Sept. 25, 2019); *Robberts v. Comm'r of Soc. Sec.*, No. 2:18-CV-00541, 2019 WL 4023549, at *5–10 (S.D. Ohio Aug. 26, 2019); *Patterson v. Saul*, No. 3:18-0641, 2019 WL 4237854, at *4–9 (M.D. Tenn. Aug. 2, 2019), *report and recommendation adopted sub nom. Patterson v. Soc. Sec. Admin.*, No. 3:18-CV-00641, 2019 WL 4237855 (M.D. Tenn. Aug. 23, 2019); *Burdine v. Comm'r of Soc. Sec.*, No. 1:17-CV-1133, 2019 WL 1349486, at *3–4 (W.D. Mich. Mar. 26, 2019). And these arguments have been the subject of serious criticism. *See Patterson*, 2019 WL 4237854, at *5–7 (collecting cases rejecting these arguments and expressing concern regarding their formulaic nature). *But see Sommers-Treon v. Comm'r of Soc. Sec.*, No. 1:18-CV-605, 2019 WL 4738022 (S.D. Ohio Sept. 27, 2019) (reversing the Commissioner's

finding of non-disability and remanding to the ALJ based on similar arguments); *Westmoreland v. Berryhill*, No. 3:17-CV-00096, 2018 WL 1522118 (S.D. Ohio Mar. 28, 2018) (same).

Plaintiff's argument fails on both procedural and substantive grounds. First, Plaintiff has waived this argument. *See, e.g.*, *Turner*, 2019 WL 5781608, at *7 (Vascura, M.J.) (collecting cases) ("The fact that Plaintiff raised his objections to the VE's testimony in a post-hearing letter to the ALJ does not resolve his error in failing to raise the issue at the administrative hearing."); *Robberts*, 2019 WL 4023549, at *8 (Deavers, M.J.) ("The Court here agrees that Ms. Santagati's opinion is less than impressive and unsubstantiated. More importantly, the Court finds that Plaintiff waived this objection because she failed to use her opportunity to cross-examine the VE regarding Ms. Santagati's opinion during the hearing."). In this case, the Court has reviewed the hearing transcript and confirmed that Plaintiff failed to raise objections to the VE's testimony based on Ms. Santagati's opinion or the outdated nature of the DOT. (*See generally* Tr. 68–88; *see also* Tr. 87–88 (objecting to the VE's methodology on separate ground)). Plaintiff's failure to raise these issues "during the hearing precludes h[er] from now asserting [them] as a basis for relief." *Turner*, 2019 WL 5781608, at *7 (quoting *Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:11-CV-1290, 2012 WL 4434078, at *3 (N.D. Ohio Sept. 24, 2012)); *see also Robberts*, 2019 WL 4023549, at *8 (internal citations and quotations omitted) ("The Sixth Circuit, along with other courts across the country, have generally recognized that a claimant's failure to object to testimony offered by a vocational expert, at the time of the administrative proceeding, waives the claimant's right to raise such issues in the district court. Both the Santagati report and O*NET existed at the time of the hearing. Plaintiff could have presented her arguments regarding both and cross-examined the VE on her theories at that time, but did not.").

Plaintiff does not argue that she was unable to present evidence regarding Ms. Santagati's opinion or the allegedly outdated nature of the DOT at the hearing. Nor could she. Her argument regarding the outdated nature of the DOT is well-established and could have been raised at the hearing. (*See* Doc. 15 at 8 ("[T]he Agency itself has long recognized the difficulties with continued reliance upon the obsolete and no longer updated DOT, embarking on at least three occasions in the last eight years into projects designed to eliminate reliance upon it."); *id.* at 8 n.3 (citing pre-2017 records from the federal government questioning the dated nature of the DOT)).

Further, Plaintiff could have obtained Ms. Santagati's opinion prior to the hearing and cross-examined the VE with it at the hearing. Although dated December 19, 2017—the same day as Plaintiff's Post-Hearing Memorandum of Law and Objections—Ms. Santagati's substantive opinion is identical to the one she has provided in prior cases. Compare her written report in this case with her October 1, 2015 report in Judge Deavers case in *Robberts*:



<mark>10</mark>

(Tr. 375–376).



*Robberts v. Comm'r of Soc. Sec.*, No. 2:18-CV-00541, Doc. 10-6 at 130–31 (S.D. Ohio) (Deavers, M.J.).

As this comparison illustrates, Ms. Santagati made several superficial changes to her October 1, 2015 report: she added a heading with Plaintiff's name; included a brief statement representing that she reviewed Plaintiff's records and was familiar with Agency regulations and procedures; and updated the number of years she had experience placing individuals into competitive employment from 24 years to 26 years. (*Compare* Tr. 375 *with Robberts*, Doc. 106 at 130–131). Otherwise, the substantive opinion expressed by Ms. Santagati in this case appears to be the same as her October 1, 2015 opinion. (*Compare* Tr. 375–76 *with Robberts*, Doc. 106 at 130–131). In short, Plaintiff could have updated Ms. Santagati's October 1, 2015 report prior to

11

the hearing and cross-examined the VE with it at the hearing. Because she failed to do so, she has waived her ability to pursue that argument here.

Second, even assuming Plaintiff did not waive this argument, it fails on the merits. Courts have consistently rejected Plaintiff's argument that an ALJ errs if, after allowing a claimant to cross-examine a VE, he or she does not explicitly address newly-raised, post-hearing objections in a written decision. *See Zimmerman*, 2019 WL 4736267, at *9 (collecting cases) ("Zimmerman has not provided jurisprudence that supports his argument that the ALJ had an obligation to explicitly address his post-hearing objections to the VE's testimony. Indeed, courts have rejected this argument.").

At the fifth step of the disability analysis, the Commissioner has the burden of demonstrating a significant number of jobs exist in the local, regional and national economies that the claimant can perform, given his or her residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). In making that determination, the Commissioner "may use the services of a vocational expert or other specialist." 20 C.F.R. § 404.1566(e). And "the testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004) (collecting cases). Such testimony satisfies the substantial evidence requirement when it is in response to a hypothetical question that "accurately portrays [the claimant's] individual physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002)).

The regulations provide that, to determine what work exists in the national economy, ALJs and VEs "will take administrative notice of reliable job information available from various governmental and other publications," including the Dictionary of Occupational Titles. 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1); *see also* SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO [Selected Characteristics of Occupations] ) for information about the requirements of work in the national economy."). As a result, "[o]ccupational evidence provided by a VE … generally should be consistent with the occupational information supplied by the DOT." *Id*. "When there is an apparent unresolved conflict between VE … evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." *Id.* An "ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p." *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009)). Instead, "[t]his obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT." *Beinlich*, 345 F. App'x at 168.

The Sixth Circuit's recent decision in *O'Neal* provides useful guidance here. — F. App'x —, 2020 WL 97414 (6th Cir. Jan. 7, 2020). "The vocational expert at O'Neal's administrative hearing testified that O'Neal was able to work as a surveillance-system monitor and noted that 60,000 surveillance-system monitor jobs existed in the economy based on the" DOT. *Id.* at *1. Although "the magistrate judge found that the ALJ failed to consider, among other things, the reliability of the vocational expert's testimony that jobs in the surveillance-system monitor

13

category exist in significant numbers in the national economy" and recommended remand, the district court rejected that recommendation and found that the ALJ properly relied on the vocational expert's testimony and that the VE's testimony was consistent with the DOT. *Id.*

On appeal, the plaintiff argued that "the DOT description of this job is obsolete, and the limited questioning on this topic at the hearing was insufficient to establish that there really are such jobs in significant numbers that are suitable for his RFC and vocational profile." *Id.* at *2 (citation, quotations, and internal alteration omitted). The Court disagreed, emphasizing "that the DOT data can establish the existence of jobs in the national economy in significant numbers." *Id.* at *3. It continued, explaining that "[a]ll that is required before an ALJ can rely on vocational evidence provided by a vocational expert is that the ALJ either ensure that the evidence does not conflict with the information in the DOT or obtain a reasonable explanation for any conflict." *Id.* at *4 (citations omitted).

> The ALJ satisfied this requirement when she asked the vocational expert whether her testimony aligned with the DOT. Contrary to O'Neal's suggestion, the ALJ was under no duty "to conduct an independent investigation" into the vocational expert's testimony to determine whether it was correct. *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006). O'Neal had a chance to cross-examine the vocational expert during the hearing, and he did not. We cannot know if cross-examination would have suggested that the surveillance-system monitor job was in fact obsolete. For example, a cross-examination could have shown that the surveillance-system monitor job requires far more training than it did when the DOT was created.
>
> Because the DOT continues to be recognized as a source of reliable job information and O'Neal did not cross-examine the vocational expert when he had the opportunity, the vocational expert's testimony constitutes substantial evidence to support the ALJ's finding that O'Neal was able to perform work that existed in significant numbers in the national economy.

*Id.*

Here, the ALJ complied with the applicable authority. He presented the VE with a hypothetical that accurately portrayed Plaintiff's individual physical and mental impairments and, as in *O'Neal*, *id.*, confirmed that VE's testimony was consistent with the occupational information supplied by the DOT. (*See* Tr. 68–70). That is all the relevant authority required in this instance. *See O'Neal*, 2020 WL 97414, at *4; *Ealy*, 594 F.3d at 512; *Beinlich*, 345 F. App'x at 168. Plaintiff's failure to cross-examine the VE regarding conflicts between the VE's testimony and other reliable sources of information, such as the DOT, "is not grounds for relief." *Beinlich*, 345 F. App'x at 168 (citing *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008)); *see also O'Neal*, 2020 WL 97414, at *4.

### B. Treating Psychiatrist

Plaintiff further argues that the ALJ erred in analyzing the opinion of her treating psychiatrist, Dr. Dailey.

Two related rules govern how the ALJ was required to analyze the opinion of Dr. Dailey. *See Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL

860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, Dr. Dailey completed a treating source statement in which she opined that Plaintiff was: markedly limited in her ability to understand, remember, or apply information; mildly limited in her ability to interact with others; markedly limited in her ability to concentrate, persist, or maintain pace; moderately limited in her ability to adapt or manage oneself; moderately limited in terms of her short term memory; moderately limited in understanding and carrying out very short and simple instructions; and moderately limited in understanding and carrying out detailed but uninvolved written or oral instructions. (Tr. 602–06). She further opined that Plaintiff: could not work appropriately with the general public or co-workers; would be off task 20% of the day; and would miss 4 or more days of work per month. (Tr. 606–07).

16

The ALJ reviewed Dr. Dailey's opinion and concluded that it was entitled to "little weight." (Tr. 24). Acknowledging that Dr. Dailey "regularly treated" Plaintiff and that she was a psychiatrist, the ALJ, nonetheless, found that her opinions were "not consistent with evidence as a whole and they [were] not consistent with her own treatment notes." (*Id.*). The ALJ continued, providing examples of inconsistencies between Dr. Dailey's opinions and treatment notes. (*See id.*). And with respect to Dr. Dailey's opinion that Plaintiff would be off task 20% of the day and miss four or more days of work a month, the ALJ emphasized that "she did not provide any support for that opinion." (*Id.*). Finally, the ALJ noted that Dr. Dailey's opinions were inconsistent with Plaintiff's "generally benign" mental status examinations and some of her activities of daily living. (*Id.*).

The ALJ did not err in his analysis of Dr. Dailey's opinion. In determining the weight of medical source opinions not entitled to controlling weight, an ALJ considers the following factors: the length, nature, and extent of treatment relationship; evidence in support of the opinion; consistency with the record as a whole; and the physician's specialization. 20 C.F.R. § 404.1527(c); *see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). The ALJ did that here. He noted the length, nature, and extent of Dr. Dailey's treatment relationship. (*See* Tr. 24 (stating that Dr. Dailey "regularly treated" Plaintiff); *see also* Tr. 21–22 (reviewing Plaintiff's 2014 through 2016 mental health treatment records, including mental health examinations performed by Dr. Dailey)). He acknowledged that Dr. Dailey was a specialist in the study and treatment of mental disorders. (*See* Tr. 24 (recognizing that Dr. Dailey is a psychiatrist)). But the ALJ found that these factors were outweighed by the fact that Dr. Dailey's opinions were not consistent with her treatment notes and the record as a whole. (*See id.*). Although Plaintiff

17

disagrees with the ALJ's ultimate interpretation of the record, the ALJ sufficiently explained why he discounted Dr. Dailey's opinions and offered adequate support for his conclusion. *See Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion."). Plaintiff's second alleged error is, therefore, without merit.

## IV.    CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors (Doc. 15) is **OVERRULED**, and judgment is entered in favor of Defendant

IT IS SO ORDERED.


Date:   February 11, 2020                          /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE